## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN WARSHAW,

        Plaintiff,

   v.

CONCENTRA HEALTH SERVICES,
et al.,

        Defendants.

CIVIL ACTION

No. 07-1994



FILED

JUN 14 2010

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

Pollak, J.

June 14, 2010

## OPINION

Plaintiff Brian Warshaw alleges that his former employer, defendant TEKsystems,

Inc. ("TEK"), a subsidiary of defendant Allegis Group, Inc. ("Allegis"), discriminated

and retaliated against him in violation of the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.

Stat. § 951 *et seq.* Plaintiff's allegations against TEK and Allegis stem in part from a

drug test administered at TEK's request by defendant Concentra Health Services

("Concentra"), which plaintiff claims was negligent in processing the test and reporting

the results to TEK. On April 6, 2010, this court held a hearing to consider (1) the motion

for summary judgment filed by TEK and Allegis, (2) plaintiff's motion for partial

1

summary judgment, (3) Concentra's motion for summary judgment, and (4) plaintiff's motion for leave to rely on an economic damages expert. By an order dated April 6, 2010, this court granted plaintiff's motion for leave. This opinion addresses the summary judgment motions.

## I.

In fall 2004, plaintiff, who has attention deficit hyperactivity disorder ("ADHD"), applied for a job with TEK, a company that places employees in information technology ("IT") jobs. TEK Mem. at 3; Pl.'s TEK Opp'n at 3. When applying, Warshaw spoke with Shelton DuVall, a TEK recruiter, who decided to place Warshaw in a short-term assignment with the Drexel College of Medicine ("Drexel"). TEK Mem. at 6; Pl.'s TEK Opp'n at 4.

Before Warshaw began working on the Drexel project, DuVall asked Warshaw to take a drug test. TEK Mem. at 6; Pl.'s TEK Opp'n at 4. This was an error: TEK only requires that its employees take drug tests when its client so requests, and Drexel had not made any such request. TEK Mem. at 6. On December 3, 2004, Warshaw took an instant drug screen, which was administered by Concentra. TEK Mem. at 6; Pl.'s TEK Opp'n at 4; Concentra Stmt. Facts ¶ 9; Pl.'s Concentra Opp'n at 5. Warshaw's urine sample tested positive for methamphetamine. TEK Mem. at 6. It is undisputed that the positive result was due to Warshaw's legal use of the prescription drug Desoxyn, which was prescribed to treat his ADHD. Pl.'s TEK Opp'n at 5; Warshaw dep. 33. Concentra reported the

2

positive result to DuVall at TEK, TEK Mem. at 6; Pl.'s TEK Opp'n at 5, and DuVall, in turn, reported the result to Richard Kaniewski, the TEK account manager in charge of the Drexel project, TEK Mem. at 6-7; Pl.'s TEK Opp'n at 5. In response, Kaniewski told DuVall that Drexel had not requested a drug test and that Warshaw could still begin working on the assignment, and DuVall relayed both the test result and Kaniewski's response to Warshaw. TEK Mem. at 7; Pl.'s TEK Opp'n at 6. Warshaw's urine sample, meanwhile, was sent to Qualisys, Inc.[1] for further testing. TEK Mem. at 9. Warshaw informed Qualisys of his Desoxyn prescription, and Qualisys then sent TEK a verified negative drug test result. *Id.*

Warshaw did begin work on the Drexel project. TEK Mem. at 7-8; Pl.'s TEK Opp'n at 6. Warshaw only worked on the project for three days, however, before he was terminated. TEK Mem. at 8; Pl.'s TEK Opp'n at 6. The reason for his termination is disputed: TEK asserts that Warshaw was terminated from the position because Patricia Pastras, the Drexel team leader on the project, complained to Kaniewski that Warshaw had "commented to [Pastras] that the project would get done a lot faster if there were fewer smoke breaks." TEK Mem. at 8. Plaintiff calls this explanation "demonstrably false." Pl.'s TEK Opp'n at 7.

Following this incident, Warshaw was not placed in any further jobs by TEK. Pl.'s

---

[1]     Qualisys was also originally named as a defendant in this case. On January 7, 2009, however, plaintiff withdrew his only claim against Qualisys.

3

TEK Opp'n at 7. In fact, aside from a few telephone calls placed to DuVall (whose response to those calls is contested), *id.*, Warshaw had no immediate further contact with TEK. On June 3, 2005, however, Warshaw filed a PHRA charge against TEK and Allegis, Pl.'s Ex. P1, and this suit followed in April 2007, Pl.'s TEK Opp'n at 8.

In August 2007, Warshaw received a telephone call from Emily Ciliberto, another TEK recruiter. TEK Mem. at 10; Pl.'s TEK Opp'n at 8. Ciliberto called Warshaw "as part of a company-wide effort to reconnect with individuals who had worked for [TEK] in the past, but who were not currently placed." TEK Mem. at 10; *accord* Pl.'s TEK Opp'n at 8. Warshaw was unable to speak to Ciliberto at the time she called, but she requested his resume, which he subsequently forwarded to her. TEK Mem. at 10-11; Pl.'s TEK Opp'n at 9. The two had one further conversation, but Ciliberto never placed Warshaw in a job. *Id.* At some point, Ciliberto spoke to DuVall, who told her that Warshaw had filed a lawsuit against TEK. TEK Mem. at 11.

Warshaw's discrimination claims under the ADA and PHRA (Counts I, II, IV, and V) arise from (1) his termination from the Drexel assignment, and (2) TEK's failure to place him in any further positions at that time. Counts I and IV allege that Warshaw was actually disabled within the meaning of the statutes, while Counts II and V allege in the alternative that TEK and Allegis regarded him as disabled. Counts III and VI, meanwhile, allege retaliation in violation of the ADA and PHRA, respectively, based on Ciliberto's failure to place Warshaw in any jobs. Finally, Count VII alleges that

4

Concentra was negligent in its handling of Warshaw's drug test. TEK and Allegis have moved for summary judgment on the discrimination and retaliation claims, plaintiff has moved for summary judgment on his retaliation claims only, and Concentra seeks summary judgment on the negligence claim.

## II.

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where the jury could reasonably find for the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute over facts is material where it could affect the outcome of the case, *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003). "In considering the evidence, the court should draw all reasonable inferences against the moving party." *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007).

## III.

The parties agree that Warshaw's discrimination claims are governed by the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Pursuant to that framework, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. To do so with regard to his removal from the Drexel project, Warshaw "must . . . show (1) he is a disabled person within the meaning of the ADA; (2)

5

he is otherwise qualified to perform the essential functions of the job, with or without

reasonable accommodations by the employer; and (3) he has suffered an otherwise

adverse employment decision as a result of discrimination." *Williams v. Phila. Housing*

*Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). With regard to his failure to hire

claim, Warshaw must show that he is disabled with the meaning of the statute and that

"(i) he applied for and (ii) was qualified for an available position, (iii) was rejected, and

(iv) after he was rejected the position remained open and the employer continued to seek

applications from persons of plaintiff's qualifications." *Taylor v. Cherry Hill Bd. of*

*Educ.*, 85 F. App'x 836, 839 (3d Cir. 2004). If Warshaw did not formally apply for a

position, he may alternatively demonstrate that he either (1) "did everything reasonably

possible to make [his interest] known," (2) "was deterred from applying . . . by . . .

discriminatory practices and would have applied for the position but for those practices,"

or (3) "had a real and genuine interest in" employment with TEK "but reasonably

believed that a formal application would be futile." *Newark Branch, NAACP v. Town of*

*Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990).

To survive a summary judgment motion, the plaintiff's evidence must be

"sufficient to convince a reasonable fact finder to find all of the elements of the prima

facie case." *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)

(applying *McDonnell Douglas* in the context of the Age Discrimination in Employment

Act). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to

'articulate some legitimate, nondiscriminatory reason for the [adverse employment decision].'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer proffers such a reason, "[t]he plaintiff must then establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination." *Id.* To do so, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

TEK and Allegis argue that they are entitled to summary judgment on plaintiff's discrimination claims for several reasons. First, they assert that Warshaw is not disabled within the meaning of the ADA and PHRA because he was neither actually disabled nor regarded by TEK as disabled. Second, TEK and Allegis argue that, even if Warshaw has properly presented a *prima facie* case of discrimination, he was discharged, and not rehired, for the legitimate reason that Patricia Pastras had complained about his conduct. Finally, defendants argue that plaintiff cannot maintain his failure-to-rehire claim because (1) the TEK employees involved in hiring decisions did not know of Warshaw's ADHD or about his drug test, (2) DuVall – the recruiter involved in the decision to terminate Warshaw from the Drexel assignment – did not place candidates in the types of jobs for

7

which plaintiff subsequently applied, and (3) with regard to positions for which plaintiff did not formally apply, there was no adverse action. I consider each of these claims in turn.

## A.

A person is disabled within the meaning of the ADA if he (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1).[2]

### 1.

Regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") provide guidance in determining whether or not a plaintiff is actually disabled because he is "substantially limited" in his major life activities. The regulations define "substantially limited" to mean that a plaintiff is either (1) "[u]nable to perform a major life activity that the average person in the general population can perform," or (2) "[s]ignificantly restricted as to the condition, manner or duration under which an

---

[2]     In 2008, Congress amended the ADA in ways that substantially alter the standards previously applied to the statute by the federal courts. Because the facts underpinning Warshaw's complaint occurred well before the amendments became effective, however, and because the amendments were not retroactive, pre-amendment standards and caselaw apply to Warshaw's claims. *See, e.g.*, *Adams v. Pennsylvania*, No. 06-cv-2154, 2009 WL 2707601, at *4 n.5 (M.D. Pa. Aug. 25, 2009) (citing further cases); *Zahavi v. The PNC Fin. Servs. Group, Inc.*, No. 07-cv-376, 2009 WL 904699, at *6 n.10 (W.D. Pa. Mar. 31, 2009) (same).

individual can perform a particular major life activity as compare to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).[3] Factors that bear on whether a substantial limitation exists include "[t]he nature and severity of the impairment," "[t]he duration or expected duration of the impairment," and "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2). As these standards suggest, "courts must adjudicate ADA claims on a case-by-case basis," although the Third Circuit has cautioned that "only extremely limiting disabilities – in either the short or long term – . . . qualify for protected status under the ADA." *Marinelli v. City of Erie*, 216 F.3d 354, 362 (3d Cir. 2000). The question is whether or not a condition is disabling as treated by medication. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999).

Plaintiff argues that he is disabled within the meaning of the ADA because he is substantially limited by his ADHD in the major life activities of working, thinking, and concentrating.[4] At his deposition, plaintiff testified to the ways in which his ADHD

---

[3]      "[T]here is some question as to the level of deference [due to] EEOC regulations interpreting definitional terms of the ADA." *Williams*, 380 F.3d at 762 n.7. In this case, however, both plaintiff and the ADA defendants cite to one or more provisions of 29 C.F.R. § 1630.2 in their memoranda of law. I therefore accept the regulations as reasonable. *See Williams*, 380 F.3d at 762 n.7.

[4]      The amended complaint also alleges that Warshaw is substantially impaired in his ability to "interact with others," First Am. Compl. ¶ 50, but plaintiff does not now argue that he is impaired in this activity.

limits him: Warshaw "need[s] to work harder at paying attention [and] keeping focused," has limited "ability to do . . . things that require a great deal of mental motion," "los[es] track" of his thoughts, "work[s] more slowly" than others, "need[s] to move around," has thoughts "come to [him] too late," and "tend[s] to get up and try to do many things at once" but "ha[s] difficulty multitasking" or "do[ing] many things at one time efficiently." Warshaw dep. 169, 178-84. Plaintiff's treating physician, Dr. Ira Herman, similarly testified that Warshaw's ADHD "affects his ability to concentrate and focus, especially on multi-step tasks," by "caus[ing] some distractibility." Herman dep. 142. As a result, Warshaw argues that he is substantially limited in the major life activities of concentrating and thinking. He also argues – for similar reasons, and because he moves around while working – that he cannot operate successfully in the environs of a large corporation and therefore is also substantially limited in the activity of working. *See* Warshaw dep. 181.

**a.**

"[O]ne is substantially limited in the major life activity of working if one is significantly restricted in one's ability to perform 'either a class of jobs or a broad range of jobs.'" *Williams*, 380 F.3d at 763 (quoting 29 C.F.R. § 1630.2(j)(3)(I)). This requires the plaintiff to be "'precluded from more than one type of job, a specialized job, or a particular job of choice.'" *Id.* (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 493 (1999)). Thus, "'[i]f jobs utilizing an individual's skills (but perhaps not his or her

10

unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.'" *Id.* (quoting *Sutton*, 527 U.S. at 493). By contrast, "even if one has the ability to perform a broad range of jobs, one is nevertheless disabled if one is significantly restricted in one's ability to perform most of the jobs in one's geographical area that utilize training, knowledge, skills and abilities similar to the job one has been disqualified from performing." *Id.*

The evidence in the record suggests that, when his ADHD and depression are treated, plaintiff is not precluded from performing a broad range of jobs. Since performing work for TEK at Drexel, Warshaw has worked unloading trucks, operating a front-end loader for a hardware store, performing surveillance and serving process for two private investigation firms, and doing computer work as an independent contractor. Warshaw dep. 105-06, 108, 112-13, 117-18, 120-21. Before working for TEK, but after being diagnosed with ADHD at the age of twelve, plaintiff troubleshot hardware, provided telephone support, and tested programming for a computer network company; loaded software for a different computer company; worked on computers at consulting and accounting firms; worked as a network analyst; and performed work for two agencies besides TEK that contracted out computer support. *Id.* at 134-47.[5] Moreover, while

---

[5] The sheer number of jobs Warshaw has held could be read as evidence that his conditions substantially limit his ability to work. Warshaw has not advanced this argument, however, and his deposition testimony presented reasons for leaving many of

11

Warshaw states that he could not deal with a job with incoming calls on multiple telephones, *see id.* at 97-98, or "anything requiring [him] to fire back and forth really quickly," *id.* at 213-14, many jobs would allow Warshaw to avoid both situations. Despite Warshaw's argument that he cannot work in corporate environments, then, there is no material issue of fact concerning whether "a host of different types of jobs are available" to Warshaw. They are, and he consequently "is not precluded from a broad range of jobs." *Williams*, 380 F.3d at 763 (internal quotation marks omitted).

Nor is Warshaw precluded from a substantial class of jobs – which is to say, from "jobs in [his] geographical area that utilize [his] training, knowledge, skills and abilities." *Id.* Warshaw works with various aspects of computers, and he testified that he would be able, without limits, to perform the work on the Drexel project, and that – with medication – he would have "no problem" performing the various other projects at TEK for which he submitted applications. Warshaw dep. 80; *see also* Defs.' Ex. 13, at 2 ("When I am on medication, I can perform the essential job functions of a support person in the computer field."). Further, it is undisputed that Warshaw has held various other jobs in the IT industry, both through other employers and on an *ad hoc*, self-employed basis. In light of this evidence of non-impairment, Dr. Herman's statement that Warshaw's ADHD "could cause a problem in certain jobs," including office jobs,

---

his jobs that are not immediately connected to his ADHD. *See* Warshaw dep. 107, 110, 136-37, 139-41, 143-45, 147; *see also id.* at 142 (stating that plaintiff did not remember why a specific job ended).

12

Herman dep. 143, is insufficient to create a material issue of fact. Simply put, because Warshaw stated that he is able to perform computer work, and has performed such work over the course of some years despite his ADHD, he is not "substantially restricted in his ability to perform jobs in" the IT industry, which utilizes his primary skills. *Williams*, 380 F.3d at 764. *A fortiori*, he is not significantly restricted from a class of jobs.

For these reasons, Warshaw is not substantially limited in the major life activity of working.

**b.**

Concentrating and thinking are also major life activities. *See, e.g.*, *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 569 (3d Cir. 2002) (concentrating); *Phoenixville Sch. Dist.*, 184 F.3d at 307 (thinking). Nothing in the record, however, indicates that plaintiff is substantially – as opposed to slightly or moderately – impaired in his ability to think or concentrate. As a threshold matter, "[c]ommon experience tells us that" occasional forgetfulness is not an "unusually restrictive limitation[] on cognitive function." *Weisberg v. Riverside Twp. Bd. of Educ.*, 180 F. App'x. 357, 363 (3d Cir. 2006). Nor is remembering particular facts later than one wishes a particularly unusual limitation.

As for Warshaw's remaining difficulties – in multitasking, maintaining attention and focus, and pacing his work – although plaintiff is limited to some degree in these areas, there is no indication that these limitations are substantial or severe. *See Dlugos v.*

13

*Eastman Kodak* Co., No. 95-1525, 1996 WL 679411, at *5 (W.D. Pa. Sept. 5, 1996)

(rejecting the notion that a plaintiff's concentration was seriously impaired because, as a

result of his condition, "[a]n extra effort was required to concentrate, particularly on

detailed paperwork"); *cf. Weisberg*, 180 F. App'x at 362 (holding a plaintiff not to be

disabled with respect to cognitive function because "he f[ell] in the bottom quartile of the

country on certain measures of cognitive function, but rank[ed] highly or in the average

range on other measures"). Crucially, plaintiff has not presented *any* evidence to

demonstrate how these limitations affect his quotidian activities, a fact that sharply

distinguishes the record in this case from decisions in which the Third Circuit has found

plaintiffs to be substantially impaired in thinking and concentration. *See Gagliardo*, 311

F.3d at 377 (describing plaintiff's use of "video and audio tapes to assist . . . in

overcoming her memory problems"); *Phoenixville Sch. Dist.*, 184 F.3d at 309 (noting that

Taylor had been forced by her condition to "leave work" and seek medical attention

"twenty-five times [in one] year," in addition to constantly "monitoring" her medication).

In fact, plaintiff testified that, as of late 2004 – the time frame in which he worked for

TEK – his conditions did *not* adversely affect any of his "day-to-day activities."

Warshaw dep. 49. I therefore conclude that, although plaintiff's ADHD is a long-term

condition that is not without effects on Warshaw's concentrating and thinking, there is no

evidence from which a reasonable fact-finder could determine that plaintiff is

substantially limited in these activities.

14

Accordingly, summary judgment will be granted to TEK and Allegis on Counts I and IV of the amended complaint, which allege that plaintiff is actually disabled.

**2.**

An individual is "regarded as" disabled for purposes of the ADA if he (1) "'[h]as a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation,'" (2) "'[h]as a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment,'" or (3) "'[h]as [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.'" *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 187 (3d Cir. 1999) (quoting 29 C.F.R. § 1630.2(l)).

The "regarded as" language in the ADA is an "attempt to eradicate what may be deeply rooted and seemingly rational presumptions about the abilities of the disabled," and thus, "[i]f an employer believes that a perceived disability inherently precludes successful performance of the essential functions of a job . . . the employer must be correct about the affected employee's ability to perform the job in order to avoid liability." *Pathmark*, 177 F.3d at 193. "By contrast, a mistake about the extent of a particular employee's impairment made in the course of an individualized determination is further from the core of the ADA's concern," and when this kind of mistake is made, "the employer will have a defense if the employee unreasonably failed to inform the employer of the actual situation." *Id.* An individual who "is erroneously regarded as

15

engaging in [illegal drug] use, but is not engaged in such use" is regarded as disabled if the employer perceived the plaintiff as substantially limited in a major life activity because of the alleged drug use. 42 U.S.C. § 12114(b)(3).

Plaintiff asserts that TEK and Allegis regarded him as disabled either due to his ADHD or because of an erroneous perception of illegal drug use. Defendants correctly respond that, even though DuVall, and perhaps Kaniewski, were aware of Warshaw's ADHD, mere knowledge of plaintiff's ADHD and/or drug test results is insufficient to show that plaintiff was regarded as disabled. *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996). Plaintiff's evidence that he was regarded as disabled, however, extends beyond mere knowledge of his condition. In particular, plaintiff contends that the temporal proximity between (1) the time DuVall learned of Warshaw's ADHD and drug test results and (2) the time plaintiff was fired, and then not re-hired, supports the inference that TEK regarded Warshaw as disabled. This proposed inference has, either standing alone or in concert with other theories, already been accepted by a number of courts as sufficient to survive summary judgment. *See, e.g., Holopirek v. Kennedy & Coe, LLC*, 303 F. Supp. 2d 1223, 1232 (D. Kan. 2004); *Bullock v. Balis & Co.*, No. 99-cv-748, 2000 WL 1858719, at *5 (E.D. Pa. Dec. 19, 2000); *Price v. Dolphin Servs., Inc.*, No. 99-cv-3888, 2000 WL 1789962, at *10 (E.D. La. Dec. 5, 2000); *Stewart v. Bally Total Fitness*, No. 99-cv-3555, 2000 WL 1006936, at *5 (E.D. Pa. July 20, 2000); *see also, e.g., Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 705 (4th Cir. 2001) (denying a

temporal proximity argument because "intimations of a medical condition" had begun much earlier).

The reasoning of these cases is persuasive: As a general matter, a fact-finder could reasonably conclude that adverse actions suffered by an employee shortly after an employer learns of the disability are, in fact, based on the employer's belief that the employee is limited in a major life activity. The inference is also permissible in this case, given that (1) Warshaw's urine sample was taken on December 3, 2004, (2) he was removed from the Drexel project about two weeks later – and before the drug test result was returned as a verified negative – and (3) defendants subsequently failed to rehire plaintiff in any other position. Moreover, although defendants stress the fact that Warshaw *began* work on the Drexel project after the positive drug result was returned and thus before DuVall learned of Warshaw's ADHD, the jury could reasonably believe that TEK allowed Warshaw to begin work on the project simply because it had no other reason – either valid or pretextual – to fire Warshaw before the project began. Accordingly, while defendants may certainly argue this point at trial, there is a material issue of fact in the record as to whether defendants regarded Warshaw as disabled.

### B.

Defendants next argue that they are entitled to summary judgment on Warshaw's discrimination claims because plaintiff was discharged, and not rehired, for the legitimate reason that Patricia Pastras, plaintiff's supervisor at Drexel, complained to TEK about

Warshaw after he commented that more work would be accomplished if there were fewer cigarette breaks. Defendants have, in other words, articulated a nondiscriminatory reason for their actions. In order to survive summary judgment, Warshaw must therefore present "evidence . . . [to] allow a factfinder reasonably to infer that [this] proffered non-discriminatory reason[] . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764. To do so, plaintiff must proffer "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (internal quotation marks omitted).

Plaintiff asserts that Pastras's deposition testimony provides evidence that TEK's stated non-discriminatory reason is pretextual. Specifically, plaintiff notes that, although Pastras has no recollection either of Warshaw or of the comment he allegedly made concerning smoke breaks, she testified at her deposition that (1) it was only Pastras's supervisor, not Pastras herself, who had the authority to recommend the termination of an employee, (2) Pastras's supervisor, not Pastras, was also the person who would have informed TEK that Warshaw should be removed, (3) Pastras did not think Warshaw's alleged comment, standing alone, merited discipline, and (4) Pastras was unlikely to ask for an employee's removal on the basis of a comment like Warshaw's. Pastras dep. 1, at 16-18, 38, 53-54; Pastras dep. 2, at 16-18; Pl.'s Ex. U, ¶¶ 7-8. Thus, although Kaniewski

18

has stated that Pastras did request Warshaw's termination on the basis of his comment about cigarette breaks, Kaniewski dep. 85-86, Pastras's testimony is sufficient to create a genuine issue of fact as to whether or not she requested Warshaw's termination. Further, this issue of fact is material to the pretext inquiry, because if Pastras did *not* recommend terminating Warshaw, a reasonable fact-finder could certainly "disbelieve the employer's articulated legitimate reasons." *Fuentes*, 32 F.3d at 764.[6]

Defendants' articulation of a nondiscriminatory reason for their actions therefore does not entitle them to summary judgment,[7] and defendants' motion will accordingly be denied as to Counts II and V insofar as those counts rest on TEK's termination of Warshaw.

---

[6]     Because I conclude that Pastras's testimony, standing alone, is sufficient to preclude summary judgment for TEK and Allegis, I will not address the additional evidence offered by Warshaw in support of his burden at the pretext stage.

[7]     In the pretext portion of their brief, defendants append an argument that, while Kaniewski made the decision to fire Warshaw, only DuVall knew of Warshaw's ADHD. TEK Mem. at 29. Defendants support this argument with the statement that DuVall and Kaniewski both "testified that Mr. DuVall did not disclose to Mr. Kaniewski that Mr. Warshaw had ADHD." TEK Mem. at 29. That assessment, however, misreads the deposition testimony of both witnesses. DuVall unequivocally and consistently testified that he has no recollection of whether or not he told Kaniewski about Warshaw's ADHD. *See* DuVall dep. 336-37, 351. Kaniewski did, at first, state that there had been no communication about "anything to do with Mr. Warshaw having a psychiatric disorder," but, after asking that the question be repeated, he answered that he did not recall and admitted that it was "possible" that such communication had occurred. Kaniewski dep. 71-72. Kaniewski also admitted that DuVall did "t[ell him] that there was a reason" that plaintiff "failed the drug test." *Id.* at 70. In light of the absence of other relevant testimony on this point, a fact-finder could reasonably draw the inference that DuVall specified that reason, and that Kaniewski therefore knew about Warshaw's ADHD.

## C.

TEK and Allegis assert three additional arguments concerning Warshaw's discrimination claim insofar as it rests on their failure to rehire him.

## 1.

First, TEK and Allegis argue that plaintiff's discrimination claim fails insofar as it rests on TEK's choice not to place Warshaw in further positions, because "there is no evidence that the individuals involved in the hiring decisions for these placements were aware of Mr. Warshaw's alleged disability." TEK Mem. at 30-31. Plaintiffs respond that, pursuant to TEK's general practice, recruiters routinely (1) check TEK's computer systems to see if another recruiter had been in contact with an applicant, and (2) forward the application to any recruiter that had been in recent contact with the applicant. *See* DuVall dep. 174-76; Ciliberto dep. 1, at 32, 37-38; Cossitor dep. 39-40. As a result, Warshaw's post-Drexel applications would have been funneled back to DuVall – who knew of plaintiff's ADHD and drug test history.

Although defendants dismiss this evidence as "speculation," TEK Reply at 8, Federal Rule of Evidence 406 specifies that "[e]vidence of . . . the routine practice of an organization . . . is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice."[8]  In other words, when a "regular response to a repeated specific situation" exists, evidence of the nature of

---

[8]     By invoking Rule 406, I do not, of course, mean to prejudge the eventual admissibility of any particular evidence at trial.

that response may be used to prove that the same action was taken in a particular case. Fed. R. Evid. 406, 1972 advisory committee notes. The testimony concerning TEK's general practices therefore raises a genuine issue of material fact as to whether DuVall received any and all future applications submitted by Warshaw. *See, e.g.*, *McClain v. Alveriaz*, No. 07-cv-5551, 2009 WL 3467836, at \*9 (E.D. Pa. Oct. 26, 2009) (discussing "compelling" habit evidence); *Shaup v. Fredrickson*, No. 97-cv-7260, 1998 WL 726650, at \*5 (E.D. Pa. Oct. 16, 1998) (denying summary judgment in part on the basis of habit evidence admissible under Rule 406); *see also Becker v. Tidewater, Inc.*, 335 F.3d 376, 392 n.9 (5th Cir. 2003) (rejecting the notion that "testimony about future events" was inadmissible as "speculative" when it concerned evidence of routine practice).

## 2.

TEK and Allegis next argue that plaintiff cannot maintain a discrimination claim based on DuVall's failure to place him in further positions, because there is no evidence that DuVall "place[d] *any* candidates in the types of positions in which Mr. Warshaw was interested." TEK Mem. at 31. There is, however, evidence in the record that any TEK recruiter could seek to place any applicant in any available position. DuVall dep. 235; Kaniewski dep. 16; Cossitor dep. 41. Accordingly, there is at least a material issue of fact as to whether DuVall *could have* placed Warshaw in the positions for which he applied. Defendants' argument will therefore be rejected.

## 3.

Finally, defendants argue that, as to positions for which plaintiff did not formally apply, he has not shown that he either (1) "did everything reasonably possible to make [his interest] known," (2) "was deterred from applying . . . by . . . discriminatory practices," or (3) "reasonably believed that a formal application would be futile." *Newark Branch, NAACP*, 907 F.2d at 1415. Plaintiff responds that he made a number of unreturned telephone calls to DuVall between December 2004 and February 2005, and that these calls constitute "ample steps to convey his interest in further placements." Pl.'s TEK Opp'n, at 22. Plaintiff's deposition testimony, however, indicates that these telephone calls were made in relation to the drug test and *not* as a means of seeking future employment. *See* Warshaw dep. 63; *see also id.* at 66-69, 75, 166, 220; Pl.'s Ex. 41; Defs.' Reply Ex. 4. Moreover, during this period, plaintiff specifically applied to a number of jobs with TEK, and there is no indication that he ever informed DuVall, or anyone else at TEK, that his interest extended to other jobs. As a result, there does not appear to be any evidence in the record that raises a material issue of fact as to whether plaintiff did everything reasonably possible to inform TEK of his interest in jobs for which he did not apply.

Meanwhile, to the extent that plaintiff argues he was deterred from applying by discriminatory practices and therefore is entitled to proceed under the second prong of *Newark Branch*, there is no evidence in the record to show that he "*would* have applied

for" further positions immediately "but for" the alleged discriminatory practices.[9] *Lula v. Network Appliance, Inc.*, 245 F. App'x 149, 152 (3d Cir. 2007) (emphasis supplied). This prong is thus also foreclosed to Warshaw.

Finally, plaintiff argues that he had a reasonable basis for believing that formal applications for further jobs would be futile under the third prong of *Newark Branch*. *See* Pl.'s TEK Opp'n at 22-23. Assuming without deciding that such a basis existed, however, plaintiff is not thereby empowered to proceed to trial on the wide-ranging theory that discrimination resulted in his non-hiring for "*all* of the positions being placed through TEK systems." *Id.* at 24. Instead, the rule is that plaintiff could only challenge positions for which he held a "real and genuine interest." *Newark Branch, NAACP*, 907 F.2d at 1415; *accord Lula*, 245 F. App'x at 152; *McCutcheon v. Sunoco, Inc.*, No. 01-cv-2788, 2002 WL 1896586, at *5 (E.D. Pa. Aug. 16, 2002). A review of the record reveals no evidence that plaintiff had such an interest in any specific position beyond those for which he submitted a formal application, and Warshaw may therefore not avail of himself of the third and final *Newark Branch* prong.

Accordingly, defendants' motion for summary judgment will be granted as to Counts II and V insofar as those counts rest on TEK's failure to rehire plaintiff in positions for which he did not formally apply, and at trial, plaintiff's Count II and V

---

[9]    Plaintiff did testify at his deposition that he "eventually" became "afraid to apply for [IT] jobs" and "became more discouraged" "as time went on." Warshaw dep. 100, 105. This testimony does not, however, suggest that his discouragement and fear were operative in early 2005, shortly after he lost his Drexel job.

discrimination claims will be limited to his allegations concerning (1) his removal from the Drexel position, and (2) TEK's failure to hire him for the subsequent positions to which he applied.

## IV.

Plaintiff seeks to bring his ADA and PHRA retaliation claims relating to TEK's failure to rehire him following his 2007 conversations with recruiter Emily Ciliberto under both (1) the *McDonnell Douglas* framework and (2) a mixed-motives theory. TEK and Allegis have moved for summary judgment on both theories, while plaintiff seeks summary judgment under the mixed-motives analysis.

### A.

For purposes of the *McDonnell Douglas* burden-shifting framework, "'in order to establish a prima facie case of illegal retaliation . . ., a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Williams*, 380 F.3d at 759 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)) (internal quotation marks omitted). In the context of a retaliation claim, an adverse action is one "that a reasonable employee would have found . . . materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & S.F. Ry. Co. v. White*, 548 U.S. 53, 68 (2006)

24

(internal quotation marks omitted) (ruling in a Title VII case); *see also Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003) ("[R]etaliation claims under the ADA are analyzed under the same framework as Title VII discrimination claims.").

There is no dispute that plaintiff's decision to file this lawsuit constitutes a protected activity. TEK and Allegis argue, however, that there was no adverse action, because Warshaw did not apply for any new placements and neither expressed interest to Ciliberto nor held a reasonable belief that application would be futile. Defendants further aver that there is no causal connection between the lawsuit and TEK's decision not to place Warshaw, both because Ciliberto had no knowledge of the substance of the lawsuit and because she "decided not to seek placements for Mr. Warshaw *before* she learned of his lawsuit," TEK Mem. at 37. Finally, defendants argue that Warshaw was not rehired for the legitimate, nondiscriminatory reason that there were better-qualified candidates.

### 1.

"[F]ailure to rehire can constitute an adverse employment action." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008). Similarly, under certain circumstances, "a reasonable employee . . . might . . . be[] dissuaded from making a charge of discrimination[] if the result would amount to no future work placements or reassignments." *White v. Cmty. Care, Inc.*, No. 07-cv-1507, 2008 WL 5216569, at *14 (W.D. Pa. Dec. 11, 2008). A failure to rehire is, however, not actionable if the plaintiff did not apply for the position and the defendant had no knowledge of the plaintiff's

25

interest. *See, e.g.*, *McWhite v. N.Y.C. Housing Auth.*, No. 05-cv-991, 2008 WL 1699446, at *12 (S.D.N.Y. Apr. 10, 2008).

The parties' arguments over whether an adverse action occurred center on the question of whether Warshaw has satisfied one or more of the prongs of *Newark Branch*. Whether or not the *Newark Branch* analysis directly transfers to the retaliation context in the wake of *Burlington Northern* is an open question. It is not, however, a question I reach here, because plaintiff has raised a genuine issue of material fact as to whether, given TEK's general practices, he applied for placements with Ciliberto. Specifically, DuVall testified at his deposition that a would-be employee could simply contact a recruiter to express generalized interest, after which the recruiter would set up a meeting with the prospective employee to discuss the company, and then place that person following a reference check. DuVall dep. 179-80. Heather Cossitor, an Allegis human resources employee, confirmed that "cold calling" could result in placement with a recruiter, Cossitor dep. 35, and Warshaw's own prior experience with TEK suggests that sending a resume could lead very directly to placement on a project, *see* Warshaw dep. 13. Given this testimony and the undisputed facts that (1) Ciliberto contacted Warshaw as part of a reengagement exercise aimed at finding former employees for future placements, and (2) Warshaw sent Ciliberto his resume, a reasonable jury could conclude that Warshaw had actually applied for a job with TEK in 2007. A genuine issue of material fact therefore exists as to whether Ciliberto's failure to rehire Warshaw

constituted an adverse action.

**2.**

Defendants next contend that the causation element is not met, because Ciliberto had no knowledge of Warshaw's lawsuit when she declined to take steps to re-hire him in 2007. TEK Mem. at 34. Defendants are correct that knowledge of the protected activity is an important ingredient of the causal connection that retaliation plaintiffs must show. *See, e.g., Moore v. City of Phila.*, 461 F.3d 331, 351 (3d Cir. 2006); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 415 (3d Cir. 1999); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 505 (3d Cir. 1997). It is undisputed, however, that Ciliberto learned at some point of Warshaw's lawsuit, and the timing of Ciliberto's knowledge vis à vis her choice not to place Warshaw remains unsettled.

Ciliberto initially spoke to, and e-mailed, Warshaw on August 17, 2007, Defs.' Ex. 18, and he replied on September 19, Defs.' Ex. 21. Ciliberto also had a second conversation with Warshaw, and she remembers no "reason why [she] didn't discuss the possibility of placing Mr. Warshaw" during that conversation. Ciliberto dep. 1, at 19. Given the possibility that this conversation postdated Warshaw's e-mail, a jury would be entitled to find that, as of sometime in mid-to-late September 2007, Ciliberto had not excluded Warshaw from consideration. Moreover, Ciliberto stated that she talked to DuVall about Warshaw and his lawsuit sometime before October 2007, and that she probably had this conversation after she spoke to Warshaw. *See id.* at 73-74, 81. At one

point in her deposition, Ciliberto even stated that one of three reasons she "never contacted Mr. Warshaw about any jobs" was "the situation" – meaning "his lawsuit against the company." *Id.* at 136-37. Thus, even though Ciliberto also stated that she never added Warshaw to her "contact list" because his lack of recent IT experience meant that she "would never be able to place him," *id.* at 23, a fact-finder could draw the inferences that Ciliberto's conversation with DuVall about Warshaw's lawsuit (1) occurred after her talks with Warshaw, and (2) was the root cause of her refusal to place plaintiff in a job.

Defendants further argue that the timing of Ciliberto's knowledge is in any case irrelevant, because she only learned that Warshaw had filed *a* lawsuit, without ever knowing its content. In maintaining that this level of knowledge is insufficient, TEK and Allegis rely on the district court's opinion in *Cline v. BWXT-Y12, LLC*, No. 04-cv-588, 2007 WL 1227482 (E.D. Tenn. Apr. 24, 2007) ("*Cline I*"). *Cline I* held that the causation requirement is not met when a decision-maker knew the plaintiff had sued the defendant but did not know the substance of the claim, "which could easily be – for example – a contract dispute or a personal injury case." *Id.* at *17. *Cline I*, however, was reversed by the Sixth Circuit. *See Cline v. BWXT-Y12, LLC*, 521 F.3d 507 (6th Cir. 2008). The Sixth Circuit's holding rested, at least in part, on the concern that adhering to the district court's resolution of the case would incentivize employers to engage in deliberate, rational ignorance of the nature of lawsuits against them and to pass facially neutral policies

preventing the hiring or retaining anyone who sued the company. *See id.* at 514.

The Sixth Circuit's opinion is persuasive. It is eminently reasonable for a finder of fact to draw the inference of knowledge of the *substance* of a lawsuit from the knowledge that a lawsuit has been filed – especially where, as here, the range of possible lawsuits is greatly winnowed by Ciliberto's statement that she knew the lawsuit was related to Warshaw's failed drug test. *See* Ciliberto dep. 1, at 78. It is also entirely reasonable to expect a corporate decision-maker, knowing that a lawsuit is in the works, to take the precautionary step of ascertaining the content of that suit. Accordingly, defendants are not entitled to summary judgment on the ground that Warshaw cannot show a causal connection between his act of filing suit and TEK's decision not to rehire him.

### 3.

Defendants are also not entitled to summary judgment on the basis of their argument that Warshaw was not placed because other candidates were better qualified. Ciliberto's admission that the instantiation of this lawsuit played a role – and the availability of the inference that she determined not to place Warshaw shortly after learning of this suit – would allow a jury to "disbelieve the employer's articulated legitimate reasons." *Fuentes*, 32 F.3d at 764.

For these reasons, defendants' motion for summary judgment on Warshaw's retaliation claims will be denied insofar as plaintiff seeks to proceed under the framework of *McDonnell Douglas*.

29

## B.

While plaintiff's fulfillment of the *McDonnell Douglas* requirements is sufficient to deny defendants' motion for summary judgment on the retaliation counts, in light of plaintiff's cross-motion for summary judgment on those counts, I must nevertheless consider whether plaintiff may proceed under a mixed motives theory in the context of either the ADA or the PHRA.

## 1.

The viability of mixed-motives retaliation claims under the ADA has recently been called into doubt by the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009). *Gross* held that, because the Age Discrimination in Employment Act ("ADEA") outlaws discrimination "'*because of* [an] individual's age,'" *id.* at 2350 (quoting 29 U.S.C. § 623(a)(1)), the burden of persuasion may not shift to the employer to mount a same-decision defense. That burden would, however, pass to the defendant under the framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). As a result, *Gross* concluded that the ADEA, unlike Title VII, does not "authorize[] a mixed-motives age discrimination claim." 129 S. Ct. at 2350.

The Third Circuit has made clear that *Gross* does not foreclose a mixed-motives analysis under *every* non-Title VII federal civil rights statute. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 n.5 (3d Cir. 2009) (discussing 42 U.S.C. § 1981). The question of whether Gross extends to the ADA is, however, an open one in this circuit. In answering

that question, this court must, of course, "'be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" *Gross*, 129 S. Ct. at 2349 (quoting *Fed. Express Corp. v. Holowiecki*, 552 U.S. 389, 393 (2008)).

The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Like the anti-discrimination provisions of the ADEA, and unlike Title VII (as amended by the Civil Rights Act of 1991), this language does not expressly allow a plaintiff to recover "by showing that [the protected characteristic] was simply a motivating factor." *Gross*, 129 S. Ct. at 2349. Further, although § 12203(a) uses the word "because" instead of the phrase "because of," "because" standing alone means "for the reason that," Merriam-Webster Online Dictionary; *accord* Oxford English Dictionary (2d ed. 1989), and hence is synonymous with "because of." Thus, just as "because of" – which is defined as "by reason of," *Gross*, 129 S. Ct. at 2350 – calls for "but-for" causation, so too does the unadorned "because" in § 12203(a). *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (determining that the "'because of' language" in the pre-amendment version of the ADA's core anti-discrimination provision "demands proof that a forbidden consideration . . . was a 'but for' cause of the adverse action complained of").

31

For these reasons, this court concludes that *Gross* bars mixed-motive retaliation claims under the ADA. Plaintiff's motion for summary judgment will therefore be denied as to Count III.

## 2.

Plaintiff and *amicus* the Pennsylvania Human Relations Commission ("PHRC") nevertheless contend that a mixed-motives claim remains available under the PHRA. As a general, though not sacrosanct, rule, however, the PHRA is interpreted in accordance with the parallel federal anti-discrimination law. *See, e.g.*, *Kelly*, 94 F.3d at 105; *Hull v. Rose, Schmidt, Hasley & DiSalle P.C.*, 700 A.2d 996, 1000 (Pa. Super. Ct. 1997). "This is because the PHRA and ADA deal with similar subject matter and are grounded on similar legislative goals." *Imler v. Hollidaysburg Am. Legion Ambulance Serv.*, 731 A.2d 169, 173 (Pa. Super. Ct. 1999). In particular, the Third Circuit has instructed that "the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fogleman*, 283 F.3d at 567.

As *Fogleman* itself held, the "anti-retaliation provisions" of the ADA and PHRA are "substantially similar," *id.*, and, as relevant to this case, they are identical. Section 12203 states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this chapter." The parallel PHRA provision states that it is unlawful "[f]or any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Cons. Stat. § 955(d).

Although the PHRA is arguably broader than the ADA in one sense, as it forbids employers from "discriminat[ing] *in any manner*," *id.* (emphasis supplied), that distinction would be relevant only to the types of adverse actions that may give rise to retaliation claims, not to whether but-for causation is required. *Gross* indicates that the controlling language on the latter point is "because" – which exists in the PHRA in precisely the same phrase (which is to say, "against any individual because such individual" has taken certain enumerated actions) as it does in the ADA. Further, although the PHRC points to the purpose of the PHRA as described by 43 Pa. Stat. § 952[10] as distinguishing the state and federal statutes, that provision does not suggest that

_____

[10]     43 Pa. Stat. § 952(b) makes it "the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their race, color, religious creed, ancestry, age, sex, national origin, handicap or disability, use of guide or support animals because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals, and to safeguard their right to obtain and hold employment without such discrimination, to assure equal opportunities to all individuals and to safeguard their rights to public accommodation and to secure housing accommodation and commercial property regardless of race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, use of guide or support animals because of

the PRHA should be interpreted at variance with the federal statute. Neither does the requirement, found in 43 Pa. Stat. § 962(a), that the PHRA be liberally construed. Nothing in the PHRA, in other words, mandates that it should be differentially interpreted in this case. Accordingly, *Gross* applies to the PHRA just as it applies to the ADA.[11]

For these reasons, plaintiff's motion for partial summary judgment will also be denied as to Count VI of the complaint.

## V.

The final argument raised by TEK and Allegis is that Allegis is not a proper defendant in this case. Plaintiff resists this argument by presenting a variety of evidence tending to show that Allegis's operations are intermingled with TEK's operations. While most of this evidence concerns general practices of Allegis, it would normally be

---

blindness or deafness of the user or because the user is a handler or trainer of guide or support animals."

[11]   I recognize that *Anderson v. Upper Bucks County Area Vocational Tech. Sch.*, 373 A.2d 126 (Pa. Commw. Ct. 1977), declined to follow the holding of *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), that a disability plan could exclude disabilities resulting from pregnancy without violating Title VII. I further recognize that no textual distinction between Title VII and the PHRA was apparent in that case. The Pennsylvania Supreme Court had, however, previously held that pregnancy discrimination was sex discrimination. *See Anderson*, 373 A.2d at 130 (citing *Cerra v. E. Stroudsburg Area Sch. Dist.*, 299 A.2d 277, 280 (1973)). The parties have pointed to – and this court has found – no analogous, preexisting decision of the Pennsylvania Supreme Court suggesting that the text of the PHRA compels the allowance of mixed-motive retaliation claims. While the PHRC suggests that the Commonwealth Court's decision in *Spanish Council of York v. PHRC*, 879 A.2d 391 (Pa. Commw. Ct. 2005), fulfills such a function, the holdings in that case as to both the plaintiff's discrimination claim and retaliation claim are based on a pretext analysis, and the Commonwealth Court did not so much as mention the mixed-motives framework when discussing the retaliation claim.

sufficient to defeat a summary judgment motion under either (1) the integrated operations test developed in cases decided under the National Labor Relations Act, *see, e.g.,* *Marzano v. Comp. Sci. Corp.*, 91 F.3d 497, 513-14 (3d Cir. 1996), which is the test proposed by the parties, or (2) the alternative test enunciated in the Title VII context by *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 84 (3d Cir. 2003). *See, e.g., Dobrick-Peirce v. Open Options, Inc.*, No. 05-cv-1451, 2006 WL 2089960, at *3 & n.3 (W.D. Pa. July 25, 2006); *Gorman v. Imperial Metal & Chem. Co.*, No. 97-cv-4764, 1999 WL 124463, at *3 (E.D. Pa. Feb. 12, 1999).

The key question to be answered, however, is whether or not Allegis can fairly be said to have been involved in the decisions to terminate, and not to rehire, Warshaw. *See, e.g., Fulton v. Johnson & Johnson Pharm. Research & Dev., LLC*, No. 05-cv-819, 2008 WL 544668, at *7 (D.N.J. Feb. 26, 2008) (citing *Zysk v. FFE Minerals USA, Inc.*, 225 F. Supp. 2d 482, 496 (E.D. Pa. 2001)); *Duncan v. Am. Int'l Group, Inc.*, No. 01-cv-9269, 2002 WL 31873465, at *3 (S.D.N.Y. Dec. 23, 2002) (citing further cases). By plaintiff's own theory of the case, it was not: Only DuVall, Kaniewski, and Ciliberto – TEK employees all – were involved, despite the presence of company policies mandating involvement by members of the human resources department, which is an arm of Allegis. *See* Pl.'s TEK Opp'n, at 19, 29-30. Plaintiff has, in other words, conceded that Allegis had no hand either in firing Warshaw or in failing to re-hire him. Accordingly, Allegis is not a proper defendant in this case, and summary judgment for Allegis will be granted on

that ground.

## VI.

Warshaw's allegations against Concentra state that it "breached its duty of care to Mr. Warshaw by not properly processing his urine sample for drug testing" and "by not properly processing the results of his drug test and by failing to follow industry standards." First Am. Compl. ¶¶ 69, 71. Concentra argues that (1) "it did not owe a professional duty of care to Plaintiff," (2) "Plaintiff cannot meet the burden of proving causation between the reporting of the results and his alleged damages," and (3) plaintiff's "claim is governed by contract law" and therefore barred by the gist of the action doctrine. Concentra Mem. at 8, 13, 16. Concentra also appears to argue that, even if it was under a duty of care to Warshaw, it did not breach that duty. *See id.* at 10-11.

### A.

Concentra's argument that it owed Warshaw no duty of care is foreclosed by the Pennsylvania Supreme Court's decision in *Sharpe v. St. Luke's Hospital*, 821 A.2d 1215 (Pa. 2003). The *Sharpe* court held that a hospital that collected a drug sample from an employee at the employer's request owed the employee "a duty of reasonable care with regard to collection and handling of her urine specimen for . . . employment-related drug testing." *Id.* at 1221. This was based upon an analysis of five factors originally enumerated in *Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000): "the relationship between the parties," "the social utility of the [defendant's] conduct," "the nature of the risk imposed

36

and foreseeability of the harm incurred," "the consequences of imposing a duty upon the [defendant]," and "the overall public interest in the proposed solution." *Sharpe*, 821 A.2d at 1219 (internal quotation marks omitted).

Although the duty theorized by Warshaw relates to the processing or reporting of a drug test, and not its collection or handling, *Sharpe*'s analysis of the *Althaus* factors applies wholesale to this case. First, as in *Sharpe*, the plaintiff "personally" went to the defendant, which "was aware of the purpose of the urine screening" and "should have realized that any negligence with respect to . . . that specimen could harm [plaintiff's] employment." *Sharpe*, 821 A.2d at 1219. *Sharpe*'s view of the second and third *Althaus* factors also applies here: "[W]hile [defendant's] participation in the drug testing process certainly has social utility," the harm to the plaintiff's employment "would be a foreseeable consequence of a breach of the duty of reasonable care." *Id.* at 1220. Fourth, like the *Sharpe* defendant, Concentra is the "entity . . . in the best position to ensure its non-negligent collection and handling" – and processing and reporting – "of the specimen, and thus, it possesses the ability to limit its liability by acting reasonably." *Id.* Finally, *Sharpe* held that "the increase in mandatory employment-related drug screening and the potential ramifications of" errors by drug testing companies "create a substantial public interest in ensuring that the medical facilities involved in the testing exercise a reasonable degree of care to avoid erroneous test results occurring because of negligence." *Id.* at 1221. Although Concentra argues that its test result was technically

37

accurate, *Sharpe*'s view of the public interest is easily extended to cover situations in which a drug test allegedly leads to the erroneous perception of illegal drug use. Accordingly, even though *Sharpe* concerned the collection and handling of a drug test, not the processing or reporting of that test, its analysis controls.[12] Concentra was therefore under a duty of care to plaintiff with regard to the processing and reporting of his drug test results.[13]

### B.

Concentra next argues that Warshaw cannot satisfy the causation requirement of a negligence claim, because he cannot prove that "his ADHD diagnosis had any bearing on TEKsystems' decisions regarding employment." Concentra Mem. at 14. Part III.B of this opinion, however, held that a genuine issue of material fact exists concerning the tie between Warshaw's ADHD (and drug test result) and TEK's decisions to terminate Warshaw from the Drexel assignment and not rehire him in other positions. Similarly, Part IV.A.2 holds that a reasonable fact-finder could find a causal tie between plaintiff's instantiation of this lawsuit and Ciliberto's decision not to rehire Warshaw. As Concentra

---

[12]      Concentra cites to *Caputo v. Compuchem Laboratories, Inc.*, No. 92-cv-6123, 1994 WL 100084 (E.D. Pa. Feb. 23, 1994), in support of the contrary conclusion. *Caputo*, however, was decided well before *Sharpe* and *Althaus*, and those intervening decisions of the Pennsylvania Supreme Court are controlling on this question of state law.

[13]      The parties vigorously spar over the applicability of certain federal drug testing guidelines to this case. Having determined that Concentra owed Warshaw a duty of care with regard to the reporting and processing of his drug test, it is unnecessary, at this stage, to specify whether or not the federal standards define that duty in whole or in part.

adds nothing to these arguments that is specific to its relationship with the plaintiff, its argument will be rejected for the reasons specified in those sections.

## C.

Concentra's third argument is that, because Warshaw signed "consent forms authorizing Concentra to perform the drug testing and report the results," plaintiff's negligence claim is really one sounding in contract and is therefore barred by the gist of the action doctrine. Concentra Mem. at 14. That doctrine "acts to foreclose tort claims: (1) arising solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim." *Reardon v. Allegheny College*, 926 A.2d 477, 486 (Pa. Super. Ct. 2007).

Here, the documents Concentra points to as contracts are not, contrary to Concentra's assertion, ones by which it "agreed to perform the test." Concentra Mem. at 16. Rather, the only documents signed by plaintiff are (1) a document giving TEK and an undisclosed "testing laboratory" the authority "to perform the appropriate tests and procedures," Concentra Ex. G, (2) a document signed by Warshaw authorizing Concentra to perform the test that sets out Warshaw's understanding that otherwise-protected information may be disclosed, Concentra Ex. H, and (3) a Qualisys form authorizing the retesting of Warshaw's sample, Concentra Ex. I. Nothing in any of these documents

39

includes any promise by Concentra to test Warshaw's urine sample, let alone to undertake accurate, non-negligent reporting of the test results.[14] In short, Concentra's duties to Warshaw cannot be found in these documents. Instead, they spring from the considerations of social policy discussed in *Sharpe* – and Pennsylvania law is clear that "'[t]ort actions lie for breaches of duties imposed by law as a matter of social policy.'" *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (quoting *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)). I thus conclude that Warshaw's action against Concentra sounds in tort and is not barred by the gist of the action doctrine.

## D.

Finally, Concentra claims that it was non-negligent as a matter of law. Under Pennsylvania law, "'[t]he determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury,'" and the question of breach is therefore one "'that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence.'" *Snead v. SPCA of Pa.*, 929 A.2d 1169, 1183 (Pa. Super. Ct. 2007) (quoting *Bloom v. Dubois Reg'l Med. Ctr.*, 597 A.2d 671, 679-80 (Pa. Super. Ct. 1991))

---

[14]     Although the parties addressed whether or not these forms constitute a "release," Concentra argues only that it was authorized to release the documents to TEK, *not* that any of these forms releases it from liability. I therefore do not consider the latter question even though it has been addressed by plaintiff's counsel.

(internal citations omitted).

This is not such a case. At a bare minimum, a reasonable jury could find that Concentra was negligent in reporting the initial positive result after expressly refusing to allow plaintiff to provide information about the prescription drug that caused the positive result. *See* Pl.'s Ex. A, at 28-29; Pl.'s Ex. E, at 28-30. A jury could also credit plaintiff's deposition testimony that, before Warshaw took the drug test, he was told that, if positive, it would be sent out for further testing – a procedure that Concentra did not follow. *See* Pl.'s Ex. A, at 29, 32. The negligence issue is accordingly one for the finder of fact to determine at trial.

For these reasons, Concentra's motion for summary judgment will be denied.

## VII.

For the foregoing reasons, (1) TEK's motion for summary judgment (docket no. 60) will be granted as to Counts I and IV of the amended complaint and otherwise denied, (2) Allegis's motion for summary judgment (docket no. 60) will be granted, (3) plaintiff's motion for partial summary judgment (docket no. 58) will be denied, and (4) Concentra's motion for summary judgment (docket no. 57) will be denied. An appropriate order accompanies this opinion.